## FERNANDEZ et ux. v. TRI-STATE TRANSIT CO. OF LOUISIANA, Inc.

### No. 6025.

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1939.

Rehearing Denied Jan. 5, 1940.

Certiorari Denied March 4, 1940.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellant.

Fernandez & Fernandez, of Franklin, J. Elton Huckabay, of Baton Rouge, and Jack & Jack, of Shreveport, for appellees.

HAMITER, Judge.

A motor bus belonging to and operated by the Tri-State Transit Company of Louisiana, Inc., skidded on the wet, slip-

pery asphalt surface of the Shreveport-Lake Charles highway about 7:30 o'clock of the morning of August 15, 1938, and crashed into a guard rail of a bridge. It was being driven by an employee, Garland E. Cameron. Aboard the vehicle were seventeen paid passengers, including Mrs. Charles E. Fernandez who was seriously injured. The accident occurred at a point approximately sixteen miles south of the City of Shreveport.

This suit was later instituted by Mrs. Fernandez and her husband, Charles E. Fernandez, the latter being an attorney at law of Franklin, Louisiana, who seek to recover damages for personal injuries, loss of personal effects and medical and other expenses, allegedly resulting from the mishap. Impleaded as defendants, and against whom a solidary judgment was asked, were the owner of the bus, its insurer, and the driver. The insurer and driver are not now parties litigant in the cause, the former having been released through a motion to dismiss the suit as of nonsuit, while service of process was never made on the latter. Only the Tri-State Transit Company of Louisiana, Inc., therefore, remains as a defendant.

Plaintiffs declare that the accident was caused solely by the gross negligence of the driver. Specifically, they aver that he was negligent in the following particulars:

"(a) Failure on the part of the driver, Garland E. Cameron, to keep and maintain a proper lookout at all times.

"(b) Failure on the part of the driver, Garland E. Cameron, to keep the Passenger Motor Transfer or Passenger Motor Bus which he was driving or operating under proper control at all times.

"(c) Driving the Passenger Motor Transfer or Passenger Motor Bus at an excessive rate of speed when he approached the Cypress Bayou Bridge where the accident occurred.

"(d) Failure on the part of the driver to retard the speed of the Passenger Motor Transfer or Passenger Motor Bus which he was driving or operating, when he was well aware of the fact that the asphalt or 'hard-surfaced' turtle back road over which he was traveling was very slick and slippery, due to the fact that it had been raining and was still raining at the time of the accident."

Defendant denies that Mrs. Fernandez was injured as alleged, that the claimed medical and other expenses for her treatment were necessary, that her personal effects were lost or destroyed, and that there was any negligence whatever in the operation of the bus. It avers, as the answer discloses, that:

" * * * the accident in which plaintiff Mrs. Charles E. Fernandez claims to have been injured, was inevitable, having been directly and proximately caused by conditions beyond its control and which human prudence, foresight, care and skill could not foresee and guard against; that it had been raining prior to said accident, thus causing the highway to be wet and slippery; that the bus in which plaintiff Mrs. Charles E. Fernandez was riding skidded upon the wet and slippery pavement of the highway, striking the concrete bridge described in plaintiffs' petition; that said bus approached the scene of the accident at a reasonable rate of speed, 12 miles or less per hour, the operator keeping a proper lookout and having perfect control thereof until it began skidding; * * *"

After the joining of issue, the Tri-State Transit Company of Louisiana, Inc., moved for a trial by jury. No objection was urged by plaintiffs and a jury trial was ordered.

A jury regularly considered the case and returned a verdict awarding Mrs. Fernandez $3,000, and Mr. Fernandez $325. The judgment of the trial court was rendered in accordance with that verdict. From it defendant appealed suspensively and devolutively.

The appeal has been answered. Mrs. Fernandez asks that the judgment be amended by increasing the award in her favor to $15,250, the amount for which she sued, and as amended, that it be affirmed. Mr. Fernandez requests only an affirmance of the judgment in so far as he is concerned.

In the vicinity of the scene of the accident, on the Shreveport-Lake Charles highway that runs generally north and south, are three concrete bridges. The one struck by the bus is the center bridge, and will be so designated hereinafter. It is approximately 140 feet long, 15 feet, 10 inches in width, and has iron guard rails on its north end which angle outwardly a distance of 8 feet, 1 inch. The highway north of this center bridge has an asphalt or black-top surface, which slopes gradually from center to sides, varying in width from 14 feet to

16 feet, has dirt shoulders extending from two to five feet, and is located on an embankment or fill estimated to be ten feet in height.

Regarding the two remaining bridges, one is located approximately 1,800 feet north of the point of collision, and will be hereinafter referred to as the first bridge, while the other, which we shall call the third, is 600 feet south of such point.

The first and center bridges are shown to be narrow or one-way passageways, while the third provides two traffic lanes.

The bus left the Shreveport station on the morning of August 15, 1938, about ten minutes after its scheduled departing time of 6:45 o'clock, for its regular daily trip south to Lake Charles. Cameron, the driver, was thoroughly familiar with the route, for he had traveled it more than fifty times. After making several stops for the purpose of heeding traffic signals and permitting passengers to enter and depart from his vehicle, he approached the first bridge. The speed of the bus was then 45 miles per hour. Previously it had varied, but had never exceeded that rate. It is testified by said driver that while negotiating a crossing of this first bridge, the speed was reduced to 30 miles per hour. Immediately thereafter, however, it was increased to 38 miles. This rate was continued until he was approximately 300 feet from an automobile that was parked on the east or left side of the highway at a point 90 feet north of the center bridge, at which time a gradual reduction was commenced. The bus passed the parked vehicle while traveling 15 miles per hour and then its motor was again accelerated to 20 miles. Shortly following this last acceleration, and while he was about 75 feet from the north end of the center bridge, another automobile, traveling toward the north, entered the south end of said bridge. Thereupon he, the bus driver, sought to bring his machine to a stop. A light application of the brakes was made, causing a skidding of the bus to its right and onto the dirt shoulder. By releasing the brake pedal and accelerating the motor he successfully returned it to the asphalted surface. Again the brakes were similarly engaged and the right wheels again proceeded off the paved portion of the highway and coursed along the dirt shoulder, a distance of approximately 30 feet. The bus was then steered slightly to the left and into the iron guard rail on the northwest corner of the bridge. As the re-

sult of the impact, which occurred with great force, its front wheels were knocked completely loose and the right side thereof was badly bent. It came to rest on the bridge. The automobile that was traveling toward the north completed its crossing and passed the bus during the latter's skidding maneuvers.

The highway's asphalt surface at and near the scene of the accident was wet, as before stated. A heavy rain had occurred the previous night· and a slight one was falling at the time. The driver says that this condition made the highway "very slick and dangerous". The dirt shoulders along the pavement were soft and slippery as a result of the rains.

The bus possessed single wheels in the front, which were equipped with tires having good tread. On the rear were dual wheels, and the tires mounted thereon had, according to the driver, "poor tread." He says that "the tread was not worn completely off of them; they were worn down quite a lot."

It is admitted by the bus driver that he knew of the highway's construction of asphalt, that it had a turtle-back shape, and was slippery, and that the center bridge possessed only one traffic lane. He further testifies that he observed the approaching automobile which prompted his attempted stopping when it was south of the third bridge and he was north of the first bridge, it then being about one-half mile from him; and that at the time of his acceleration of the bus' motor after passing the parked vehicle, it appeared to him that the operator of said approaching machine, which was then at the south end of the center bridge, "was going to stop and let me by".

In the case of Lou Owens v. S. F. Monzingo et al., 191 So. 581, 583, decided by this court but not yet reported [in state report], we observed that in actions of this kind, "a prima facie case of negligence against a defendant common carrier is established when a plaintiff shows that he was a paid passenger on its vehicle and was injured while thereon. It then becomes the duty of the defendant, in order to avoid liability for the injuries sustained, to prove its freedom from any negligence, which might have caused the attending accident, sufficient in probative weight to overcome plaintiff's prima facie case." Authorities cited in support of that doctrine were Cusimano v. New Orleans Public Service, Inc.,

170 La. 95, 127 So. 376, and Wallace v. Shreveport Railways Co., La.App., 175 So. 86.

■ In the instant case, we find that the defendant has not sustained the burden which it carries. The proof offered in support of its contention that the driver was free from any negligence that might have caused the accident does not satisfactorily rebut the prima facie case established by plaintiffs.

Rule 4, paragraph (a), of Section 3 of Act 286 of 1938, provides as follows:

"Except as herein provided and subject to the provisions of Rules 3 and 17, and subject to the special speed limits specified in this Act, it shall be unlawful for any person to drive or operate any motor or other vehicle upon the public roads, highways and bridges of this State at other than a careful, prudent, reasonable and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing, and no person shall, under any circumstances or conditions, drive any vehicle upon the public roads, highways or bridges of this State, at such a speed as will endanger the life, limb or property of any other person; and, subject to the special provisions and limitations contained in this Act, the person so driving or operating, or causing to be driven or operated, a motor vehicle on such public roads, highways and bridges, shall be held and deemed to be prima facie at fault in and responsible for any accident or damage proximately flowing therefrom or connected therewith, which presumption, however, may be rebutted and overcome by proper showing of the contrary."

■ The above recited speed of 20 miles per hour, employed by the bus when the skidding began, is the estimate given by the driver Cameron. His machine was equipped with no speedometer. Other witnesses fixed such speed at various rates up to 45 miles per hour. The force with which the bus struck the guard rails, the severing of the front wheels therefrom and other damage, and its proceeding onto the bridge after the impact, force the conclusion that the driver's estimate is too low and that the vehicle must have been traveling at least 30 miles per hour. Considering this speed, and the knowledge possessed by the driver regarding the slippery condition of the highway, the narrowness of the bridge, the poor tread of the tires on the rear dual wheels, and the approach of the north bound automobile, it must be held that he was operating his machine in a matter violative of the quoted statutory provision and was not free of negligence.

Defense counsel cite and rely on the cases of Karp v. Powers et al., 12 La.App. 518, 124 So. 781, and Siren v. Montague, La.App., 142 So. 196, in which there is recognized the doctrine announced by the Supreme Court in Barret v. Caddo Transfer & Warehouse Co., 165 La. 1075, 116 So. 563, 58 A.L.R. 261, that the mere fact that a motor vehicle skids is not evidence of negligence. We make no criticism of this doctrine. It appears to us, however, that the cited cases are not applicable here, for it was definitely shown and found therein that the driving of the offending truck was being performed cautiously and prudently when the skidding occurred. In the instant case that character of vehicular operation on the part of defendant's agent is not proved.

The award of damages of $3,000 in favor of Mrs. Fernandez is contested by both her and defendant, the former asserting its inadequateness and the latter insisting that it is clearly in excess of the amount to which she is entitled. The sum of $325 granted the husband is questioned only by defendant.

The record discloses that Mrs. Fernandez, who was 49 years of age, five feet, four and one-half inches in height and weighed 182 pounds, received the following injuries as a result of the accident:

(a) A deep cut on the forehead about one and three-fourths inches long, commencing just below the edge of the hairline and extending towards the base of the nose.

(b) A deep cut over the left eye about one and one-half inches long which bruised the super-orbital nerve.

(c) Left knee cut, bruised and lacerated, and its cap knocked out of the socket. A weakened condition of this member followed.

(d) Right knee severely bruised.

(e) Right eye bruised, resulting in its paining and being discolored for a period of about five weeks.

(f) Bruise of left eye, causing its closing and a swelling in that region for a period of several days, and also causing

the discoloration of its lower lid which endured when the case was tried more than six months later.

(g) Fracture of nasal bones, involving and injuring the antrum on the left side of the head, resulting in a profuse discharge of blood for several days, slight permanent disalignment, and some aggravation of a prior infection of the sinuses. The added infection caused pain in and about the hips and her blood pressure to rise from a normal of 138 to 172, where it remained for several months.

(h) Stomach injured, resulting in pain there for about five weeks.

(i) Numerous lacerations, bruises and brush burns, in addition to those above described, with discolorations resulting therefrom.

(j) Considerable shock to the nervous system, and much pain and suffering.

The patient was under the continuous care of a physician from August 17, 1938, to January 25, 1939, during which period she received treatment on 33 different occasions.

All of the cuts, lacerations, bruises, fractures and brush burns healed in due course of time. The cut on the forehead left a permanent scar about one and one-half inches long, while a similar scar one inch long remained over the left eye. The forehead scar is not noticeable except at close range, while the other is hidden by the left eyebrow. The hair of this eyebrow, however, grows irregularly by reason of the scar, and has the appearance of being slightly elevated. A permanent scar about the size of a half dollar remains on the left knee.

The damages claimed by the husband, concerning which evidence was adduced, are for physician fees, destruction of personal articles and effects, and expenses in connection with medical treatment.

The jury fixed the amount of damages awarded to each of these plaintiffs after having considered all of the evidence. An appellate court gives much weight to a jury's assessment of damages and will not change it unless the quantum decided on is clearly disproportionate. Maddox v. Pattison et al., La.App., 186 So. 894, and cases therein cited. The stated reason requiring a disturbance of the assessment in this case does not exist.

The judgment is affirmed.